FILED ___ LODGED
___ RECEIVED ___ COPY

NOV 2 6 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

SEALED

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

UNITED STATES OF AMERICA
*ex rel.* [SEALED],

    Plaintiff,

      – Against –

[SEALED],

    Defendant.

No.: **CV24-03328-PHX-MTL**

**FALSE CLAIMS ACT COMPLAINT**

and

**JURY DEMAND**

**[TO BE FILED UNDER SEAL]**

**FILED IN CAMERA AND UNDER SEAL UNDER
31 U.S.C. § 3730(b)(2)
DO NOT POST ON ECF
DO NOT PUT IN PRESS BOX**

Stephen A. Teller, WSBA #23372
Teller Law
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969

*Counsel for Plaintiff Relator*

COMPLAINT and JURY DEMAND - 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DANIEL FOSTER, | No |
| Plaintiff, | **FALSE CLAIMS ACT COMPLAINT** and **JURY DEMAND** |
| v. | |
| LAUNCH TECHNICAL WORKFORCE SOLUTIONS, LLC, a Delaware corporation; LAUNCH MANAGEMENT SERVICES, LLC, a Delaware corporation; and LAUNCH INDUSTRIAL, LLC, an Illinois corporation, | **[FILED UNDER SEAL]** |
| Defendants. | |

## NATURE OF THE CLAIM

Relator hereby brings this action on behalf of the United States of America against a group of closely affiliated corporations for violating the False Claims Act by submitting materially false applications for Paycheck Protection Program ("PPP") loans and associated forgiveness, for which Defendants did not qualify due to their size. Defendants fraudulently applied for and received forgiveness of over $10 million in PPP loans from the Small Business Administration. In applications for the loans and forgiveness, Defendants falsely claimed they operate an Airplane Manufacturing business, when in reality they operate a Staffing Agency. They did so intentionally in order to circumvent the $30 million revenue limit for their industry and falsely claim eligibility on the basis of the size standard for aircraft manufacturers, which had an employee-based limit of 1,500 workers regardless of revenue.

The PPP was intended to support small businesses, but Defendants are not small businesses. Rather, Defendants own and operate a group of affiliated companies that, counted together, were simply too large to qualify for small business support under any of the available standards, including the industry eligibility standard for their true industry. This is not a close

**COMPLAINT and JURY DEMAND - 2**

call, but an obvious intentional fraud.  This matter is further based on the facts and information set forth below.

## PARTIES

### A.    LAUNCH TECHNICAL WORKFORCE SOLUTIONS, LLC.

1.    Defendant Launch Technical Workforce Solutions, LLC, is a Delaware Corporation.  Its primary address is 814 Commerce Drive, # 250, Oak Brook IL 60523-1965.

2.    Defendant's business involves recruiting and employing workers, primarily to customers in the aviation sector and other technical fields.

3.    Defendant Launch Technical Workforce Solutions, LLC, is, and its owners and employees are, responsible for applying for the SBA loans referenced herein, seeking forgiveness of them, and for all other acts alleged herein which were taken by the corporations and individuals acting for its/their benefit and/or on its/their behalf.

### B.    LAUNCH TECHNICAL MANAGEMENT SERVICES, LLC.

4.    Defendant Launch Management Services, LLC, is a Delaware Corporation.  Its primary address is 814 Commerce Drive, # 250, Oak Brook IL 60523-1965.

5.    Defendant's business involves recruiting and employing workers, primarily to customers in the aviation sector and other technical fields.

6.    Defendant Launch Management Services, LLC, is, and its owners and employees are, responsible for applying for the SBA loans referenced herein, seeking forgiveness of them, and for all other acts alleged herein which were taken by the corporations and individuals acting for its/their benefit and/or on its/their behalf.

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

### C.    LAUNCH INDUSTRIAL, LLC.

7.    Defendant Launch Industrial, LLC, is an Illinois Corporation which currently holds a "terminated" status with the State of Illinois.  Its primary address is or was 700 Commerce Drive, # 140, Oak Brook IL 60523-1965.

8.    Defendant's business involves recruiting and employing workers, primarily to customers in industrial fields.

9.    Defendant Launch Technical Workforce Solutions, LLC, is, and its owners and employees are, responsible for applying for the SBA loans referenced herein, seeking forgiveness of them, and for all other acts alleged herein which were taken by the corporations and individuals acting for its/their benefit and/or on its/their behalf.

### D.    "Launch TWS" and Other Affiliated Entities

10.    The named Defendants are effectively one company through close affiliation of ownership and management.  They are referred to collectively herein as Launch TWS.

11.    Other entities may be similarly affiliated with Launch TWS, including some identified or referenced herein.  Any such other responsible and affiliated entities are hereby placed on notice that by this reference they are, and/or may in the future be explicitly, named as Defendants if they took out SBA loans, sought forgiveness, or are affiliated, connected with, or responsible for the Defendants' actions as alleged herein.

### E.    Relator – Daniel Foster

12.    Mr. Foster is an American citizen who has investigated Defendants and brings this action on behalf of the US government under the Qui Tam provisions of the False Claims Act, 31 USC § 3729 *et seq.*

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

14.     The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a). The Court has personal jurisdiction over Defendants because they transact business, or seek to transact business, within this district.  Specifically, Launch TWS has supplied workers for companies in Arizona.

15.     Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c) because Defendants transact business or can be found within this district.

16.     No allegation in this Complaint is based solely on a public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, administrative, or General Accountability Office, or other Government report, hearing, audit, or investigation; or from the "news media." Rather, Relator is an original source as that term is defined in relevant law.  To the extent there has been such prior disclosure, Relator caused that disclosure to be made by his voluntary prior report to the government, and remains an original source.

17.     Prior to filing this lawsuit, Relator made a voluntary disclosure to the US government.

18.     Under 31 U.S.C. § 3730(b)(2), this Complaint shall be filed in camera and under seal and shall not be served on Defendant until the Court so orders.

**COMPLAINT and JURY DEMAND - 5**

# FACTS

## I.    Governing Law

### A.    The Federal False Claims Act

19.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so.  31 U.S.C. § 3729(a)(1).

20.    As of the date of filing, any person found to have violated these provisions is liable for a civil penalty of not less than $13,508 and not more than $27,018 for each such violation, plus three times the damage sustained by the Government.

21.    The FCA imposes liability where conduct is knowing or is "in reckless disregard of the truth or falsity of the information."  The law is clear that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

22.    The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that - … is made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest …." 31 U.S.C. § 3729(b)(2)(A).

23.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations and determines whether to intervene. 31 U.S.C. §3730(b).

COMPLAINT and JURY DEMAND - 6

24.     Relator alleges that the False Claims Act was violated in connection with Defendants' applications for Paycheck Protection Program loan and forgiveness when Defendants violated the size, affiliation, and need rules of said Program, obtaining funds from the U.S. Government Small Business Administration to which it was not entitled.

**B.      The Paycheck Protection Program**

25.     The Paycheck Protection Program ("PPP") is the United States Government business loan program established in 2020 through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to help certain businesses, self-employed workers, sole proprietors, nonprofit organizations, veterans' organizations, and tribal businesses to continue employing and paying their workers during the COVID-19 pandemic. The program is administered by the U.S. Small Business Administration ("SBA").

26.     The PPP allowed qualified entities to apply for low-interest private loans to pay for their payroll and certain other operating costs. The PPP loan was intended to be used to cover only payroll costs, rent, interest, and utilities.

27.     The PPP was added under Section 1102 of the CARES Act by amending Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a) *et seq.*, which temporarily permitted the SBA to guarantee 100 percent of the PPP loans.

28.     The SBA guaranteed the loans to Defendants which are identified herein.

29.     PPP recipients could later apply to have their loans partially or fully forgiven if they kept employee counts and employee wages stable.  The SBA would pay off forgiven loan amounts to the lender, constituting income to the program participants.

30.     Section 1106 of the CARES Act, which also amended Section 7(a), provides for forgiveness of up to the full principal amount of qualifying loans.

COMPLAINT and JURY DEMAND - 7

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969   steve@stellerlaw.com

31.     False statements related to loan applications and forgiveness applications meant income to Defendants from the SBA through the lender, and improperly cost the government the amounts of the loans plus interest.  Additional damages include fees paid to the lender by SBA.

32.     The deadline for entities to apply for a first draw PPP loan was initially June 30, 2020, which was later extended to August 8, 2020.  There was a second draw program as well. The Program ended on May 31, 2021.[1]

33.     The SBA specifically warned potential borrowers that civil and criminal liability could attach to false applications.  *See e.g.,* 85 Fed. Reg. 20811 at 20814 (April 15, 2020).

34.     Defendants were on notice from SBA and also from their own bank that they had obligations to carefully review eligibility before applying, and yet they knowingly (or recklessly) disregarded knowledge of ineligibility.

### i.     *Counting Size – Employee and Alternative Size Rules*

35.     The PPP loan program was designed and intended to benefit *small* businesses, and thereby to facilitate continued employment when funds might not otherwise be available to keep the economy going during the pandemic.  Businesses could be small on the basis of employee counts or other financial criteria.

36.     Pre-existing SBA regulations defined how to count the number of employees. As applied to the PPP the method was by averaging the number of employees by month for a period preceding the loan application, or in the calendar year 2019.  See e.g., 13 C.F.R. 121.106 (b).

---

[1] *See* Paycheck Protection Program, U.S. SMALL BUSINESS ADMINISTRATION, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last visited Dec. 9, 2021).

**COMPLAINT and JURY DEMAND - 8**

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969   steve@stellerlaw.com

37.    Additionally, 13 C.F.R. 121.106 (a) states:

(a) In determining a concern's number of employees, SBA counts all individuals employed on a full-time, part-time, or other basis. This includes employees obtained from a temporary employee agency, professional employer organization or leasing concern.

38.    SBA regulations make clear that it is the average number of employees of the concern that is used (including both domestic and any foreign affiliates).  13 C.F.R. 121.106(b)(1).  The CFR states that the average should be based on the preceding 24 calendar months, although other SBA guidance indicates a 12-month period may be used for PPP loans. See, e.g., See "PAYCHECK PROTECTION PROGRAM LOANS Frequently Asked Questions (FAQs)" No. 2; FAQ No. 14.

39.    For the purpose of determining eligibility, guidance provided by the SBA generally advised borrowers they were eligible if, combined with their affiliates, using these methods they counted 500 or fewer employees (300 for "second draw" loans) or had a <u>tangible net worth</u> that did not exceed $15 million on March 27, 2020, **and** an average <u>net income</u> that did not exceed $5 million for the two full fiscal years prior the date of the PPP application.[2] Additionally, some variation in these size measures by industry (identified by NAICS code) was permitted, with some industries having higher maximum financial or employee sizes for eligibility.

40.    Thus, an applicant for a first draw PPP loan could qualify as an eligible business under any of three standards:

---

[2] See "SBA Information Notice", issued by U.S. Small Business Administration. September 29, 2010; as amended, e.g., 13 CFR § 121.301 (size standards later amended upwards from $15 m net worth per 89 Fed.Regis. 11703 and 11712).

**COMPLAINT and JURY DEMAND - 9**

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

(a) **Fewer than 500 employees**: The business must have an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first draw PPP loan (see 15 U.S.C. §636(a)(36)(D)(i)(I) and SBA, PPP Loans Frequently Asked Questions, No. 14 (April 6, 2020));

(b) **Alternative size standard**: The business must have (i) a maximum tangible net worth of not more than $15 million, *and* (ii) average net income after tax of not more than $5 million for the business's two full preceding fiscal years as of March 27, 2020 (see 86 Fed. Reg. 15083, 15085 n.5 (Mar. 22, 2021) and SBA, PPP Loans Frequently Asked Questions, No. 2); or

(c) **Industry standard**: The business must be smaller than standards created for each type of industry. These are employee-based and/or revenue-based size standards which corresponding to the business's primary industry, per the appropriate NAICS code (see 15 U.S.C. § 636(a)(36)(D)(i)(II) and SBA, PPP Loans Frequently Asked Questions, No. 2); 13 CFR §121.201.

41. Relevant here, the PPP application required an applicant to certify that it is smaller than one or more size standard, i.e., that it, "employs no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

42. Defendant Launch Technical Workforce Solutions, LLC (and thereby also the collective affiliated Launch TWS Defendants) had greater than 500 employees and reported 500 or more employees to SBA and its bank upon application for its loan. Defendants are too large for the default 500-employee standard to apply.

**Teller Law**
300 Lenora St. #1471
Seattle, WA 98121
(206) 324-8969  steve@stellerlaw.com

43.     Defendants also are too large for either the applicable industry size standard or the alternative size standard because their revenue, net income and tangible net worth are too large.

ii.    ***Affiliation Rules Required Defendants to Aggregate Their Information***

44.     A business could not qualify for PPP loans without considering all associated or "affiliated" businesses.  Multiple separate corporations often work together as one business. The SBA require that such affiliated companies be counted as one for determining PPP eligibility.

45.     Eligibility as a small business, whether by number of employees, revenue, net revenue, and/or net worth, is determined in the aggregate for affiliated companies such as Defendants. Due to their joint ownership and management, the SBA affiliation rules mean that Defendants must be considered as a unit under any or all of these size measures when determining their status as a small business for purposes of the PPP loans they took out.  All parts of Launch TWS  and any other companies affiliated through joint ownership or management should have been considered together as one unit.  These rules apply to all such affiliations, both for purposes of need as well as for purposes of eligibility for loans and forgiveness.

46.     Regardless of the maximum number of employees allowed, or alternative or industry size measurements available, the SBA's existing affiliation rules applied. For example, all employees of affiliated entities under the same ownership or control "count" towards the employee limit.  See "AFFILIATION RULES APPLICABLE TO U.S. SMALL BUSINESS

**COMPLAINT and JURY DEMAND - 11**

ADMINISTRATION PAYCHECK PROTECTION PROGRAM"[3] which references affiliation based on ownership or management.

47.     Regarding ownership, the SBA made clear "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity".  Regarding management control, it states, "Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns."

48.     Additionally,

(e) Affiliation [may be] based on common management. Affiliation arises where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of one or more other concerns.

(f) Affiliation [may be] based on identity of interest. Affiliation may arise among two or more persons with an identity of interest. Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated. Where SBA determines that such interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate.

*Id.* at (e) and (f).

49.     Additionally, Section 121.103 includes the following:

(1) Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists.

(2) SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists.

---

[3]  See https://www.sba.gov/document/support-affiliation-rules-paycheck-protection-program

COMPLAINT and JURY DEMAND - 12

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

(3) Control may be affirmative or negative. Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

(4) Affiliation may be found where an individual, concern, or entity exercises control indirectly through a third party.

13 CFR §121.103(a).

50.    Under 13 C.F.R. 121.106 (b)(4) not only are an applicant business's employees counted towards the questions of eligibility, but so are employees of any closely affiliated businesses.

51.    Additional similar affiliation rules regarding ownership are set forth at 13 C.F.R. § 121.301(f) following the reference that "The size of the applicant combined with its affiliates must not exceed the size standard designated ..." See 13 C.F.R. § 121.301(a)(2). Thus affiliation is not only measured for employees, but also for the other size standards, such as revenue, net worth, and the like.

52.    See, for example, the May 2020, SBA-issued interim final rule in the Federal Register at Vol. 85 N. 99 (May 21, 2020) at p. 30835 regarding 13 CFR Parts 120 and 121, in which SBA indicated that the CFR did indeed mean what it said regarding small businesses and that "The fact that an applicant might be eligible for a PPP loan if it has 500 or fewer U.S. employees does not mean that the applicant is not also subject to the other requirements applicable to the PPP. ... If an applicant, together with its domestic and foreign affiliates, does not meet the 500-employee [maximum] *or other applicable PPP size standard*, it is not eligible for a PPP loan." [emphasis added]

53.    These affiliation rules should apply in determining if a loan was financially necessary as well, since related parts of a corporate group can more easily lend each other money or exchange capital than unrelated or separate entities would. See SBA FAQ No. 31 (the

COMPLAINT and JURY DEMAND - 13

1  certification of need must "tak[e] into account their current business activity and their ability to

2  access other sources of liquidity")

3       54.     Defendants are affiliated companies whose employee numbers, assets, revenue,

4  and net income, and resources should have been aggregated for purposes of determining

5  eligibility for these multiple first draw loans.  When those affiliates are considered, Defendants

6  are too large to qualify for the loans or forgiveness, and lacked need.[4]

7       55.     Defendants' applications for the three PPP loans stated over 700 total employees,

8  constituting an admission that if they are affiliated, they are too large for the standard 500

9  employee test.

10          *iii.*   ***Industry Size Standards and NAICS Classifications***

11       56.     For SBA purposes, the definition of a "small business" varies based on North

12  American Industry Classification System (NAICS).  The NAICS is a comprehensive system used

13  by the United States government and adopted by many local governments for multiple purposes,

14  including reporting of economic statistics.  The SBA publishes a table of the "number of

15  employees or annual receipts indicates the maximum allowed for a concern and its affiliates to

16  be considered small" based on NAICS code, specifically, the North American Industry

17  Classification Manual (NAICS Manual). This system was included the first-draw PPP program

18  as an alternative to the 500-employee maximum for some industries. 13 C.F.R. 121.201

19       57.     Either during the initial loan application process or at the time of loan

20  forgiveness, the SBA required applicants to submit the NAICS code of their primary industry,

21  which is directly tied to the businesses' principal business activity.

22       58.     In 13 CFR § 121.107, the SBA defines a concern's "primary industry" as follows:

23          *In determining the primary industry in which a concern or a concern combined*
          *with its affiliates is engaged, SBA considers the distribution of receipts,*
24

---

25  [4] Indeed, Launch Technical Workforce Solutions, LLC is, by itself, too large to qualify, even without aggregation
    of its affiliated companies.

**COMPLAINT and JURY DEMAND - 14**

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

*employees and costs of doing business among the different industries in which business operations occurred for the most recently completed fiscal year. SBA may also consider other factors, such as the distribution of patents, contract awards, and assets.*

59.    As a rule, in setting the size limits, the SBA uses the number of employees for manufacturing industries and average annual receipts for services industries. [5] It deliberately chose these separate criteria in order to fairly distinguish between sectors.

60.    In the applicable NAICS Manual, i.e. the 2017 version, which was effective in April 2020, the government defines Sector 31-33, Manufacturing, as follows: "The Manufacturing sector comprises establishments engaged in the mechanical, physical, or chemical transformation of materials, substances, or components into new products."

61.    Recognizing the many other activities that are involved in manufacturing new products, the NAICS manual explains that an external service provider should be classified based on its primary industry and not necessarily as a manufacturer (emphasis added):

> *Manufacturing establishments often perform one or more activities that are classified outside the Manufacturing sector of NAICS. For instance, almost all manufacturing has some captive research and development or administrative operations, such as accounting, payroll, or management. These captive services are treated the same as captive manufacturing activities. **When the services are provided by separate establishments, they are classified in the NAICS sector where such services are primary, not in manufacturing.***

62.    For example, although accounting is a critical component of the manufacturing process, it would be improper to classify an accounting firm as a manufacturer. Suppliers of inputs to the manufacturing process such as Defendants are classified according to their respective primary industries, not the primary industry of their customers.

63.    The SBA makes this clear.  For example, it uses the definition in 13 CFR 121.406(b)(2) to determine eligibility as a manufacturer for small business set-aside contracts:

> *For size purposes, there can be only one manufacturer of the end item being acquired. The manufacturer is the concern which, with its own facilities, performs*

---

[5] See Page 12 of SBA Size Standards White Paper.pdf.

**COMPLAINT and JURY DEMAND - 15**

*the primary activities in transforming inorganic or organic substances, including the assembly of parts and components, into the end item being acquired."* [6]

64.     Under the SBA's definition, there can only be one manufacturer of an end item. Critical here is that a manufacturer uses its own facilities with the primary purpose of producing a new item.

65.     Defendants claimed they were aircraft manufacturers (NAICS code 336411).

66.     The 2017 NAICS Manual defines 336411 Aircraft Manufacturing as follows:

*This U.S. industry comprises establishments primarily engaged in one or more of the following: (1) manufacturing or assembling complete aircraft; (2) developing and making aircraft prototypes; (3) aircraft conversion (i.e., major modifications to systems); and (4) complete aircraft overhaul and rebuilding (i.e., periodic restoration of aircraft to original design specifications).*

67.     A company in the industry of NAICS 336411 (Aircraft Manufacturing) will be considered a small business if it employs 1500 or few workers.  It may have any amount in revenue.

68.     A company working in the industry of NAICS 561320 (Temporary Help Services) was considered a small business at the time of the PPP loans in question if its revenue was $30 million or less.  See 84 Fed.Reg 34261 at 34277 (July 18, 2019).

69.     The NAICS Manual defines Sector 56, Administrative and Support and Waste Management and Remediation Services, as "establishments performing routine support activities for the day-to-day operations of other organizations."

70.     Under Sector 56 is Industry Group 5613, Employment Services:

*This industry group comprises establishments primarily engaged in one of the following: (1) listing employment vacancies and referring or placing applicants for employment; (2) providing executive search, recruitment, and placement services; (3) supplying workers to clients' businesses for limited periods of time to supplement the working force of the client; or (4) providing human resources and human resource management services to client businesses and households.*

---

[6] See 13 CFR 121.406(b)(2) (Apr. 1, 2020) https://www.ecfr.gov/on/2020-04-01/title-13/part-121/section-121.406#p-121.406(b)(2)

**COMPLAINT and JURY DEMAND - 16**

71.    Within this industry group is NAICS industry 561320, Temporary Help Services:

*This industry comprises establishments primarily engaged in supplying workers to clients' businesses for limited periods of time to supplement the working force of the client. The individuals provided are employees of the temporary help services establishment. However, these establishments do not provide direct supervision of their employees at the clients' work sites.*

72.    According to the index of the 2017 NAICS manual, the following are included within NAICS industry 561320:

- Contract staffing services
- Labor (except farm) contractors (i.e., personnel suppliers)
- Personnel (e.g., industrial, office) suppliers

73.    Defendants are a staffing agency.  They provide employees to other companies. They are paid to recruit and supply workers to other companies, and administer those workers' pay and benefits.  As is described in more detail below, the proper NAICS code for this industry is in the 5613 sector, including 561320 (Temporary Help Services).

74.    Launch TWS would only appropriately be classified under NAICS industry group 5613, Employment Services, which Launch TWS has historically used in its dealings with private industry, the IRS, and local government—other than when it claimed to SBA for purposes of the PPP loan that it was an Aircraft Manufacturer.

75.    Defendants claim that they are an Aircraft Manufacturer under NAICS, is false.

76.    This false certification was intentional, and designed to obtain PPP loan(s) and other SBA benefits to which Defendants knew they were not entitled.  SBA would not have loaned Defendants CARES Act funds or forgiven those loans with interest, or paid the lender fees, if Defendants had accurately stated the proper NAICS code.

77.    This was a knowing false certification, as is described in more detail below.

**COMPLAINT and JURY DEMAND - 17**

1

*iv.*    ***Rules Regarding Need***

2

78.    Every version of the first-draw and second-draw PPP application forms required

3

borrowers to certify, "Current economic uncertainty makes this loan request necessary to

4

support the ongoing operations of the Applicant"

5

79.    In addition, the SBA's guidance FAQs included question 31 on this topic:

6

31. **Question:** Do businesses owned by large companies with adequate sources of
liquidity to support the business's ongoing operations qualify for a PPP loan?

7

**Answer:** In addition to reviewing applicable affiliation rules to determine
eligibility, all borrowers must assess their economic need for a PPP loan under the
standard established by the CARES Act and the PPP regulations at the time of the
loan application. Although the CARES Act suspends the ordinary requirement that
borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of
the Small Business Act), borrowers still must certify in good faith that their PPP
loan request is necessary. Specifically, before submitting a PPP application, all
borrowers should review carefully the required certification that "[c]urrent
economic uncertainty makes this loan request necessary to support the ongoing
operations of the Applicant." Borrowers must make this certification in good faith,
taking into account their current business activity and their ability to access other
sources of liquidity sufficient to support their ongoing operations in a manner that is
not significantly detrimental to the business. For example, it is unlikely that a public
company with substantial market value and access to capital markets will be able to
make the required certification in good faith, and such a company should be
prepared to demonstrate to SBA, upon request, the basis for its certification.

8

9

10

11

12

13

14

15

16

17

80.    Defendants certification that Launch TWS had need for the funds was a false

18

statement.

19

**II.    Defendants Multiple PPP Loans and Forgiveness – False Claims**

20

81.    Defendants are affiliated companies under SBA regulations and are required to

21

aggregate their employees, net income, net worth, and/or revenue for purposes of determining

22

eligibility.

23

82.    Additional affiliated companies and any other associated businesses should be

24

considered affiliates of Defendants. Their employees, net income, net worth, and/or revenue

25

COMPLAINT and JURY DEMAND - 18

1   must also be aggregated for purposes of determining eligibility for the PPP loans identified

2   herein, even if they did not take out loans themselves.

3        83.    Defendants were not eligible for the loans they took out and sought forgiveness

4   for, including the following:

5   **A.    The Launch Technical Workforce Solutions, LLC Loan**

6        84.    On April 15, 2020, Launch Technical Workforce Solutions, LLC, was approved

7   for a first-draw PPP loan of $10,000,000 through MidFirst Bank (loan number 2083627203).

8        85.    On information and belief, the other Defendants herein also applied for a loan on

9   the same date.

10       86.    Launch Technical Workforce Solutions, LLC stated its address as 700

11  Commerce Drive Suite 140, Oak Brook, Illinois.

12       87.    The SBA loan database indicates Launch Technical Workforce Solutions, LLC

13  listed at least 500 jobs on its application, implying that it may have claimed eligibility for the

14  PPP under the alternative size or industry size standards.

15       88.    Launch Technical Workforce Solutions, LLC alone employs more than 500

16  people.

17       89.    Launch Technical Workforce Solutions, LLC, classified itself under 336411

18  (Aircraft Manufacturing), which had an industry size standard of $30 million in revenue for

19  first-draw loans in 2020.

20       90.    On information and belief, Launch Technical Workforce Solutions, LLC itself

21  (even without application of the affiliation rules to aggregate all Defendants) had over $30

22  million in annual revenue in the relevant time frame.

23       91.    On information and belief, Launch Technical Workforce Solutions, LLC itself

24  (even without application of the affiliation rules to aggregate all Defendants) had net income in

25  excess of $5 million. Including affiliates, it had net assets in excess of $15 million.

**COMPLAINT** and **JURY DEMAND - 19**

92.     Launch Technical Workforce Solutions, LLC applied for loan forgiveness on 9/2/2021, and the SBA granted forgiveness of $8,181,368.  The SBA also paid MidFirst Bank a lender processing fee of $100,000 in connection with the loan.

**B.     The Launch Management Services Loan**

93.     On April 15, 2020, Launch Management Services, was approved for a first-draw PPP loan of $1,572,700 through MidFirst Bank (loan number 1955987210).

94.     On information and belief, the other Defendants herein also applied for a loan on the same date.

95.     Launch Management Services stated its address as 700 Commerce Drive Suite 140, Oak Brook, Illinois.

96.     The SBA loan database indicates Defendant Launch Management Services listed 121 jobs on its application.

97.     Launch Management Services, classified itself under 336411 (Aircraft Manufacturing), had an industry size standard of $30 million in revenue for first-draw loans in 2020.

98.     Launch Management Services applied for loan forgiveness on 9/2/2021, and the SBA granted forgiveness of $ 1,594,324.  The SBA also paid MidFirst Bank a lender processing fee of $47,181 in connection with the loan.

**C.     The Launch Industrial LLC Loan**

99.     On April 15, 2020, Launch Industrial LLC, was approved for a first-draw PPP loan of $356,900 through MidFirst Bank (loan number 1919087203).

100.     On information and belief, the other Defendants herein also applied for a loan on the same date.

101.     Launch Industrial LLC stated its address as 700 Commerce Drive Suite 140, Oak Brook, Illinois.

COMPLAINT and JURY DEMAND - 20

102.    The SBA loan database indicates Defendant Launch Industrial LLC listed 90 jobs on its application.

103.    Launch Industrial LLC, classified itself under 336411 (Aircraft Manufacturing), which had an industry size standard of $30 million in revenue for first-draw loans in 2020.

104.    Launch Industrial LLC applied for loan forgiveness on 9/2/2021, and the SBA granted forgiveness of $361,807.  The SBA also paid MidFirst Bank a lender processing fee of $10,707 in connection with the loan.

## III.    Defendants Were Ineligible for These Loans

105.    As is stated above, Defendants are affiliated companies whose resources should have been aggregated for purposes of determining eligibility for these multiple first draw loans. When those affiliates are considered, Defendants are too large to qualify for the loans or forgiveness. [7] Defendants falsely classified themselves under a NAICS code to which they were not entitled to use in order to feign eligibility despite their affiliations. Further, they had no good faith claim of need for the funds.

106.    At all relevant times, Launch TWS has had more than 500 employees and revenue in excess of $200 million.

107.    The Launch TWS companies mainly provide aviation workforce staffing, industrial workforce solutions, diesel technician labor, and recruitment services. Both prior to seeking PPP loans and after, the companies have always classified themselves under NAICS industry group 5613 (Employment Services) and NAICS industry 561320 (Temporary Help Services.

108.    However, when aggregated, Defendants are too large to qualify for PPP loans under the industry codes Defendants had historically used.  In order to still qualify, Launch TWS

---

[7] Even without aggregation, Launch Technical Workforce Solutions, LLC, which took out the largest loan, is too large by itself.

COMPLAINT and JURY DEMAND - 21

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

1  knowingly improperly and falsely classified itself under NAICS 336411 (Aircraft

2  Manufacturing) in the PPP loan application process.  Launch TWS leadership intentionally

3  falsified its NAICS code in an attempt to defraud the government.

4      109.    Although aircraft manufacturers are one of Launch TWS's client types, this does

5  not make it an aircraft manufacturer under SBA guidelines, nor has it ever represented itself as

6  an aircraft manufacturer before or since.

7      110.    Defendants defrauded the SBA and the American people, falsely obtaining PPP

8  monies. By listing a NAICS code they had never used in the past and clearly knew they were not

9  eligible to use, Defendants claimed to be something other than what they were in order to

10  circumvent the PPP size rules and receive free money intended to aid small businesses during a

11  national emergency.

12      111.    Launch TWS had sufficient access to capital through other avenues and likely did

13  not need PPP loans to remain operational. The private equity-backed company defrauded the

14  American taxpayer and deprived genuine small businesses of desperately-needed aid for its own

15  gain.  Further, Defendants' business model means they have few permanent staff, and temporary

16  staff are only paid when working for customers, meaning Defendants are receiving revenue for

17  every hour worked, and are at no risk of liability to idled employees.

18  **A.    Defendants Are One Company**

19      112.    The Defendants which comprise Launch TWS (also referred to herein as

20  "Defendant Launch TWS") should be aggregated into one company for purposes of eligibility

21  due to common ownership and management.

22      113.    Launch TWS was founded in 2011 by Ian Rollo (chairman of the board), Jean

23  Rollo (President of Launch Management Services / board member), and Mike Guagenti (CEO /

24  board member). These individuals also have an ownership stake in the company.

25

COMPLAINT and JURY DEMAND - 22

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

114.    In 2017, Launch acquired Aviation Managed Solutions of Griffin, Georgia.   In 2018, Launch TWS took on a minority equity investment from Argentum Capital. Argentum partners Daniel Raynor and Chris Leong joined the Launch TWS board of directors at this time. Shortly after the investment, Launch TWS acquired transportation staffing company TransTechs and aviation maintenance staffing company PlaneTechs from TrueBlue, the parent company of JetBlue, for $11.4 million.  In 2019, Launch TWS expanded internationally with the creation of Launch Global Solutions in British Columbia, Canada.

115.    Over the years, Launch TWS has grown significantly to become, as it claims on its website, "the world's largest workforce solution for the aviation industry."  See https://www.launchtws.com/history-mission/ (last visited 11/17/2024).

116.    Defendants herein comprise one business known to the public as "Launch Technical Workforce Solutions."  The company is a staffing and workforce management company that specializes in providing technical staff for several industries, particularly aviation, defense, manufacturing, and transportation. Its headquarters is at 814 Commerce Drive, Suite 250 Oak Brook, Illinois 60523.

117.    Launch Management Services, LLC and Launch Industrial, LLC, both also of Oak Brook, Illinois, are subsidiaries of Launch Technical Workforce Solutions, meaning they are owned and controlled by the same people and/or entities.

**B.    Defendant Launch TWS Was Too Large for These Small Business Loans**

118.    **Number of Employees:** Launch TWS did not qualify under the number of employees test (which is:  having an average of no more than 500 employees during 2019 or during the 12 months prior to applying for a first draw PPP loan (see 15 U.S.C. §636(a)(36)(D)(i)(I) and SBA, PPP Loans Frequently Asked Questions, No. 14 (April 6, 2020));

COMPLAINT and JURY DEMAND - 23

119.    On information and belief, in April, 2020, Launch TWS had more than 700 permanent or temporary employees as listed across its PPP applications.

120.    The true number of employees is likely to be much higher.  For example, on one day in 2019 alone, Launch TWS advertised 723 open positions on its website.

121.    **Alternative size standard:** the business must have (i) a maximum ***tangible net worth*** of not more than $15 million, ***and (ii) average net income*** after tax of not more than $5 million for the business's two full preceding fiscal years as of March 27, 2020 (see 86 Fed. Reg. 15083, 15085 n.5 (Mar. 22, 2021) and SBA, PPP Loans Frequently Asked Questions, No. 2); or

122.    The exact tangible net worth of Launch TWS is unknown, but in October 2018 it disclosed assets of $26,271,000.00 and liabilities of $20,963,000.00 in a Puerto Rico corporate filing.  Simple math results in a net worth of $5,308,000.00 shortly before the PPP loans were sought.

123.    In addition, Launch TWS previously had a corporate headquarters at 700 Commerce Drive, Suite 140, Oak Brook Illinois.  The following companies, also located at 700 Commerce Drive Suite 140, Oak Brook, Illinois are also owned and managed by Ian Rollo and / or Jean Rollo: N307JL, LLC; Desert Wing, LLC; Hidden Canyon Retreat, LLC, Serenity IMR Holdings, LLC.  Jean Rollo also owns real estate holding companies. These businesses are also affiliates of Launch TWS under the PPP affiliation rules.

124.    In or around the relevant time period, known assets held by these affiliated entities exceeded $20 million:

- **N307JL, LLC:** A 2000 Gulfstream G100 aircraft worth with a list price of approximately $6.25 million.
- **Desert Wing, LLC:** A sprawling Hamptons property purchased in 2021 for $7.4 million.
- **Hidden Canyon Retreat:** Several other Hamptons properties sold in 2024 for a combined $7 million.

**COMPLAINT and JURY DEMAND - 24**

- **Serenity IMR Holdings, LLC:** A holding company for one or more yachts or boats owned by Ian Rollo.

125.    Even without factoring in the other Launch TWS entities and Jean Rollo's real estate companies, the known combined worth of these companies exceeds $25 million.

126.    On the basis of Launch TWS's positive net worth, its growing revenue in excess of $200 million in 2017, and the visible success of the Rollos, it is reasonable to assume that net income after federal taxes at Launch TWS also exceeded $5 million.

127.    **Industry standard:** an employee-based and/or **revenue-based** size standard corresponding to the business's primary industry, per the appropriate NAICS code (see 15 U.S.C. § 636(a)(36)(D)(i)(II) and SBA, PPP Loans Frequently Asked Questions, No. 2); 13 CFR §121.201.

128.    Manufacturing companies generally have employee-based limits while service companies have revenue-based limits.  When using the industry qualification standard, these replace the default 500 employee limit.

129.    Launch TWS operates in the "Temporary Help Services" sector and has always classified itself under corresponding NAICS codes for this service industry. In 2020, the "Temporary Help Services" industry had a revenue-based size standard of $30 million.

130.    According to information disclosed by founder Ian Rollo on LinkedIn, the company reached $200 million in annual revenue by 2017.

131.    Launch TWS was thus ineligible for the PPP under the size standard for its primary industry because it had more than $30 million in revenue.

132.    Launch TWS did not qualify as a small business under the revenue size standard for the temporary help services industry. In order to receive PPP funds, it chose to falsely classify itself as an aircraft manufacturer in order to improperly take advantage of an employee-based size standard under which it could qualify.

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com

**C.    Launch TWS Falsely Claimed it was an Aircraft Manufacturer**

133.    Launched TWS claimed it was an Aircraft Manufacturer (NAICS 336411) on its PPP loan applications.

134.    This sector has an industry size standard measured in employees rather than revenue. The applicable standard is a maximum of 1500 employees.

135.    The false NAICS Code selection made it appear that Defendants qualified under the industry standard because it had over 500 but fewer than 1500 employees.

136.    By claiming NAICS Code Aircraft Manufacturer, Defendant made a false certification which was material to the government.

**C.    Launch TWS is a Staffing Agency, Not an Aircraft Manufacturer**

137.    Launch TWS has historically classified its primary industry under NAICS industry group 5613 (Employment Services) and NAICS industry 561320 (Temporary Help Services).  This is Launch TWS's most appropriate primary industry classification under SBA and PPP rules.

138.    Defendant Launch Technical Workforce Solution, LLC possesses a certification from the FAA for aircraft repair.  Defendants stated "Air Carrier Line Maintenance" on the FAA certification application when seeking to become an official Repair Station operator.

139.    Line Maintenance in aviation refers to routine maintenance tasks and inspections performed on an aircraft to ensure its airworthiness and readiness for flight. These tasks are typically carried out between flights or overnight.

140.    This certification does not make Defendants fit the Aircraft Manufacturing criteria, nor do any other facts about their services.

141.    Launch TWS has historically described itself as a provider of labor services. The company group has no manufacturing facilities of its own. It does not produce a final product.

COMPLAINT and JURY DEMAND - 26

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969   steve@stellerlaw.com

Rather, Defendants provide labor services for customers to utilize at the customer's respective facilities (or other-owned facilities) in the production and maintenance of their own final products.

**D.     Scienter:  This Was Not an Accident**

142.     Launch TWS operates in the staffing industry and has historically classified itself under NAICS industry group 5613 (Employment Services) and NAICS industry 561320 (Temporary Help Services).

143.     The PPP application required an applicant to certify that it, "employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry." Since Launch TWS had more than 500 employees, it would have had to reference 13 C.F.R. 121.201 to ascertain the size measure for its industry. This CFR, in turn, references the NAICS Manual for industry definitions.

144.     Defendants falsely claimed they were aircraft manufacturers (NAICS code 336411) in connection with their PPP loans intentionally, in an attempt to qualify for the PPP loans because they had more than 500 employees and at least $200 million in revenue, far more than the $30 million allowed for a staffing agency.

145.     The company group has no manufacturing facilities of its own. It does not produce a final product. Rather, Defendants provide labor services for customers to utilize at the customer's respective facilities (or other-owned facilities) in the production and maintenance of their own final products.

146.     Thus Launch TWS is appropriately classified under NAICS industry group 5613, Employment Services, *which it has historically otherwise used* in its dealings with private industry, the IRS, and local government. Given the frequency with which Launch TWS has used

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969   steve@stellerlaw.com

this NAICS industry in other contexts, it clearly knew it was not eligible to classify itself as an aircraft manufacturer at the time of the PPP loans.

147.    For example, just prior to the COVID pandemic in November 2019, Launch TWS signed a "Staffing Services Agreement" with the aircraft overhaul company Aersale, Inc., of Goodyear, Arizona. The contract refers to Launch TWS as a vendor engaged in the business of "providing temporary staff to perform services for clients on a temporary basis" (emphasis added):

> *Beginning on the Effective Date, Client designates Vendor as a provider of temporary labor at its various locations (the "Services"). Vendor will source and place its employees (each an "Assigned Employee") to provide services on a temporary basis to Client (each placement is an "Assignment").*

148.    Launch TWS also uses this industry classification in its dealings with the IRS. For every year Launch TWS has filed Form 5500, Annual Return/Report of Employee Benefit Plan, with the IRS, the company consistently classified itself under NAICS 561300, the general code for the Employment Services industry group. This includes its earliest filing in 2012, its 2020 filing, and its most recent filing in 2023.

149.    Launch TWS has also consistently presented itself to local authorities as a staffing agency. Starting in 2018, in filings with the Hawaii Secretary of State, it has described its business purposes as a "staffing solutions firm focusing primarily in aviation".

150.    As recently as 2022 Launch TWS has listed the same business purpose in its filings with the Rhode Island Secretary of State, using NAICS industry 561330 (Professional Employer Organizations). This NAICS industry is within the 5613 Employment Services industry group and adjacent to 561320 (Temporary Help Services), and like Temporary Help Services, in 2020 Professional Employer Organizations had an SBA eligibility revenue cap of $30 million.  13 CFR 121.201 (2019).

151.    Launch TWS has described itself in a similar manner and with similar NAICS codes to the states of West Virginia, Utah, Arizona, and Washington, among others.

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969   steve@stellerlaw.com

152.     The Launch Management Services subsidiary has an office in Renton, Washington (near a Boeing facility), and an active business license there under NAICS code 561311 (Employment Placement Agencies).

153.     On information and belief, Launch TWS has never before or after officially claimed to any federal, state or local government body that it manufactures aircraft.

154.     No part of any Defendant or affiliated company possess any FAA or other license or certification which would allow it to manufacture aircraft for profit.

155.     Defendants and their affiliates do not possess airworthiness certifications or production certificates.

156.     Defendant's demonstrated ability to use the correct NAICS code elsewhere reflects its knowledge that its claimed NAICS Aircraft Manufacturer classification was false.

157.     Similarly, review of PPP loan applications made by other temporary staffing agencies and aircraft manufacturers shows no confusion among Launch TWS's industry peers about how to properly classify themselves.  The lack of confusion by any of its competitors reflects its reckless or knowing choice of false certification.

158.     Launch TWS's lender, like most lenders, encouraged PPP borrowers to educate themselves about the program's rules.  MidFirst Bank's instructions to its customers included, "visit the SBA's PPP website frequently to stay abreast of any and all guidance."

159.     In addition to the PPP application forms, Launch TWS also would have signed a promissory note with MidFirst Bank for each of its loans. Another MidFirst Bank promissory note involving an unrelated PPP loan contains the following clause:

> *SBA Payment Protection Program. Borrower knows and understands all terms of Coronavirus Aid, Relief, and Economic Security Act (or the CARES Act) of 2020, and all SBA rules and guidance regarding the Payment Protection Program, and has not relied, and will not rely, on Lender or any of Lender's shareholders, directors, officers, agents, employees, or representatives in determining whether Borrower is eligible for said Program or Debt Forgiveness.*

COMPLAINT and JURY DEMAND - 29

160.    Defendants thus again certified here - to their bank - that they had read and understood the PPP rules. This false certification to the bank caused the government to fund and eventually forgive the loans.

161.    Finally, 505 days passed between the time Launch TWS took its three PPP loans and the date it sought forgiveness of these loans.  News reports during this time made nearly everyone aware of concerns about PPP loan abuses. In addition, the SBA issued numerous guidance documents reiterating the PPP eligibility rules. Launch TWS did not review or change its status, even when it applied for forgiveness and therein certified that the application materials submitted for the loan were accurate and it was eligible for the loan.  Specifically, it certified "The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects.".

162.    Like many other ineligible PPP borrowers, Launch TWS could have repaid the low interest loan it had received. Instead, it chose to double down on its fraud and seek forgiveness of the over $10 million loan which it had fraudulently obtained.

**E.    <u>Backing and Business Model Meant No Good Faith Claim of Need</u>**

163.    Defendants did not need these funds.  Employment staffing companies, including Defendants, have relatively few permanent staff of their own, and many temporary workers who are paid by the customers.  Temporary employees know they are only paid for the times they are working.  When they are not working, Defendants have little overhead.

164.    Similarly, prices for the services, and wages paid to the employees can vary on a short term basis, again reducing economic uncertainty to near zero.

165.    Finally, it was obvious from early in the pandemic that employment staffing agencies either employed "essential" workers, i.e., continued operations, or alternatively had few actual costs relative to their size if they were shuttered, due to their pre-existing business model.

COMPLAINT and JURY DEMAND - 30

166.    Regarding "other sources of liquidity to support ongoing operations," as referenced in SBA FAQ No. 31, if any were needed, Defendants are partly owned by Argentum Capital, a private equity funder, use a corporate jet owned by the Rollo family, who, as referenced above, also have substantial additional assets valued in the millions of dollars or more.

**V.    Violations of the False Claims Act**

167.    Between and among them, Defendants obtained over $10 million in forgiven loans and interest from the Small Business Administration and the SBA incurred costs associated with paying the lender to produce those loans.  These are elements of damages in this case.

168.    Defendants did not qualify for the PPP loans or forgiveness under the 500-employee test, the industry standard test, or the alternative size test.

169.    Defendants falsely certified loan and loan forgiveness applications by falsifying their NAICS code to qualify for the PPP despite having far in excess of the number of employees, net worth, revenue, and/or net income allowed, including under the affiliation rules.

170.    Had Defendants truthfully listed their correct industry and accounted for all of their affiliations, the SBA would not have granted the PPP loans and associated forgiveness.

171.    Additionally, Defendants had no need for PPP funds and could have obtained financing from other sources such as their private equity investor.

172.    Had Defendants truthfully stated that they did not need the money, the loans would not have been granted.

173.    These falsifications were material to the SBA, including as evidenced by the significant rules and guidance promulgated by SBA before and during the pandemic, and those

**COMPLAINT and JURY DEMAND - 31**

related to PPP loans, as well as the space for number of employees on the PPP forgiveness application and certification on the forgiveness application that the statements used to obtain the loan were true.

174.    The false certifications of need were also material to the SBA, as evidenced by the same guidance, including those quoted herein, and on the loan application.

175.    Defendants violated the False Claims Act by submitting materially false applications and supporting materials in connection with their applications for PPP loans and forgiveness.

176.    Defendants did so in order to obtain money belonging to the US government to which it was not otherwise entitled.

177.    Each of the above-described PPP loan and forgiveness applications constitute false claims.

178.    Each of the above-described PPP loan and forgiveness applications are false because they make, at a minimum, the false statements referenced below:

    a.   The applications listed a false NAICS code;

    b.   The revenue, net income and/or net assets were falsely underreported;

    c.   The applications falsely attest that the company needed the funds and lacked access to other sources of liquidity;

    d.   The applications falsely attest to compliance with the Paycheck Protection Program and entitlement to the PPP loan and forgiveness funds.

179.    In reality, Defendants, along with other companies including those identified herein, are part of a group of affiliated companies as the word "affiliation" is defined and used in the relevant SBA regulations. After accounting for the affiliations, they were ineligible for the PPP under the revenue-based size standard for their industry. To circumvent this, they

**COMPLAINT and JURY DEMAND - 32**

improperly classified themselves as an airplane manufacturer in order to falsely qualify on the basis of their headcount.

180.    As a result, Defendants did not qualify for PPP loans or forgiveness making each of the applications fraudulent in violation of the False Claims Act at least insofar as each reported or attested to compliance with the PPP loan and forgiveness program rules, regulations, and laws.

## CAUSES OF ACTION
## COUNT I
**Violations of the False Claims Act: Presenting or Causing a False Claim**
**(31 U.S.C. § 3729(a)(1)(A))**

181.    The foregoing allegations are repeated and realleged as if fully set forth herein.

182.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present, or cause to be presented, false claims for payment or approval.

183.    Defendants knowingly, recklessly and/or willfully violated the False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

184.    Specifically, and as alleged in more detail above, Defendants presented, or caused to be presented, materially false applications for PPP loan funds and then for forgiveness of the resulting loans.

185.    Defendants certified compliance with applicable PPP laws, rules, and regulations despite not being compliant.

186.    Defendants similarly certified the existence of facts which were not true.

187.    Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that the facts and certifications to which it attested were not true and that it made, presented, or submitted, or caused to be made, false or fraudulent claims for payment to the government.

**COMPLAINT and JURY DEMAND - 33**

188.    Each of the applications submitted or caused to be submitted by Defendants is a separate false and fraudulent claim.

189.    Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

190.    The United States was unaware of the foregoing circumstances and conduct of Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made to or on behalf of Defendants, made such payments, and has been damaged.

191.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

## COUNT II
### Violations of the False Claims Act:
### Making, Using, or Causing to be Used a False Record or Statement
### (31 U.S.C. § 3729(a)(1)(B))

192.    The foregoing allegations are repeated and realleged as if fully set forth herein.

193.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.

194.    Defendants knowingly, recklessly and/or willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

195.    Specifically, for purposes of obtaining or aiding to obtain PPP loans and then forgiveness of those loans, Defendants made or presented, or caused to be made or presented, to the United States false or fraudulent applications and/or records, knowing these materials to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

COMPLAINT and JURY DEMAND - 34

196.    Each application or record submitted to the Government in support of Defendants' above-described false claims is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

197.    The United States was unaware of the foregoing circumstances and conduct of Defendants and, in reliance on said false and fraudulent applications and/or records, authorized payments to be made to or on behalf of Defendants, made such payments, and has been damaged.

198.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III
### Violations of the False Claims Act: Obligation to Repay
### (31 U.S.C. § 3729(a)(1)(G))

199.    The foregoing allegations are repeated and realleged as if fully set forth herein.

200.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or  conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

201.    Upon receipt of improperly obtained PPP loan forgiveness funds, Defendants had an obligation to repay and refund to the Government the amounts paid by the government.

202.    Defendants knowingly, recklessly and/or willfully violated the False Claims Act by failing to so repay or refund the monies received.

203.    The United States was unaware of the foregoing circumstances and conduct of Defendants.

COMPLAINT and JURY DEMAND - 35

204.    Had the government been aware of Defendants' knowing false certifications and knowing failure to return overpayments it would have taken steps to recover them.

205.    The United States has been damaged as a result in an amount to be determined at trial.

**WHEREFORE, Relator, on behalf of himself as well as the United States requests the following relief:**

a.    A judgment against Defendants in an amount equal to all damages due to the Government, including treble damages, under the FCA;

b.    A judgment against Defendants for all civil penalties due to the Government for Defendants' violations of the FCA;

c.    That Relator recover from Defendants all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

d.    That Relator recover from Defendants all reasonable attorneys' fees in bringing this action;

e.    That Relator be awarded the maximum amount of the proceeds of this action as allowed under 31 U.S.C. § 3730, and/or any other applicable provision of law;

f.    That a trial by jury be held on all issues so triable;

g.    An award of pre- and post-judgment interest; and

h.    Such other and further relief to Relator and/or the United States of America as this Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby requests a trial by jury.

Dated:  November 20, 2024

By:  _____

Stephen A. Teller, WSBA #23372
300 Lenora St. #1471
Seattle, WA  98121
Telephone:    206 324 8969
Email:    steve@stellerlaw.com
*Counsel for Plaintiff Relator*

COMPLAINT and JURY DEMAND - 36

**Teller Law**
300 Lenora St. #1471
Seattle, WA  98121
(206) 324-8969  steve@stellerlaw.com